**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BEVERLY JO JENKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 18 C 7031** |
| | ) | |
| **ANDREW MARSHALL SAUL,[1]** | ) | **Judge Rebecca R. Pallmeyer** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Beverly Jo Jenkins applied for a period of disability, disability insurance benefits, and supplemental Social Security income on July 1, 2015, alleging disability beginning on June 1, 2011. (Administrative Record ("R") at 18.) Initially, Plaintiff claimed that she was suffering from heart failure, hypertension, diabetes, arthritis, depression, edema in legs, and glaucoma. (R. at 110.) Later, she submitted evidence that she suffers from asthma, obesity, right-hand "trigger finger" (a condition in which a finger is stuck in a bent position), retinal disorders, and obstructive sleep apnea. (R. at 21.)

The Social Security Administration ("SSA") denied Plaintiff's application in November 2015 and again, after reconsideration, in February 2016. (R. at 18.) Plaintiff requested a hearing before an Administrative Law Judge in February 2016 and retained counsel in April 2016. (R. at 18, 176-79.) Following a hearing on August 31, 2017, the ALJ concluded in a written decision that Plaintiff was not disabled between June 1, 2011 and March 31, 2017 (the "insured period") because she has the residual functional capacity ("RFC") to perform light work as an "office associate/check

---

[1]     When Plaintiff filed this lawsuit, Nancy A. Berryhill was the Acting Commissioner of Social Security.  Andrew M. Saul was sworn in as the Commissioner of Social Security in June 2019.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he is substituted as Defendant.

writer" and "general clerk." (R. at 18-31.)[2]  On August 22, 2018, the Social Security Appeals Council denied Plaintiff's request for review (R. at 1), and in October 2018, Plaintiff filed this lawsuit under 42 U.S.C. § 405(g) to challenge the ALJ's decision.  Her central challenge is to the ALJ's determination of her RFC; according to Plaintiff, the ALJ did not properly account for her visual, manipulative, and mental limitations.  In her Complaint and supporting brief, Plaintiff asks the court to reverse the ALJ's decision and remand the matter for an award of benefits, or, in the alternative, remand the matter for additional proceedings.  (*See* Compl. [6]; Pl. Br. in Supp. of Reversing the Decision of the Commissioner of Social Security ("Pl. Br.") [13] at 15).  Defendant filed a motion for summary judgment [20], and Plaintiff filed a reply [22].  For the reasons explained here, the court concludes that the ALJ's explanations are inadequate to support his RFC determination and remands the case pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

## BACKGROUND

Plaintiff, born on December 26, 1957, claims to have become disabled on June 1, 2011, when she was 53 years old.  (R. at 110.)  She graduated from high school and took some college classes, but she did not earn a college degree and has no vocational training.  (R. at 45.)  In the 15 years before the alleged onset of her disabilities, Plaintiff performed semi-skilled work, including as a check writer, meter reader, switchboard operator, data entry clerk, and general clerk.  (R. at 30.)  Plaintiff has not engaged in substantial gainful activity as defined in the Social Security Act since June 1, 2011.  (R. at 21.)  She has attempted temporary clerical employment since then, but according to her testimony at the administrative hearing, her physical and mental limitations prevented her from keeping any of the jobs.  (R. at 21, 54-55, 67.)  Below, the court

---

[2]    Residual functional capacity refers to work a claimant can do despite her physical and/or mental limitations, "based upon medical evidence as well as other evidence, such as testimony by the claimant or [her] friends and family."  *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (internal quotation marks omitted).

recounts Plaintiff's medical history and the administrative decisions on her Social Security application.

**A.    Medical Evidence**

**1.    Obesity and Diabetes**

Plaintiff's medical records show that she is approximately 5 feet 4 inches tall and weighs about 275 pounds.  (R. at 24, 825, 830.)  Based on her body mass index ("BMI") she is considered obese.  (*Id.*)[3]  Plaintiff was diagnosed with type 2 diabetes[4] in 2000, and some of her medical records describe the condition as "uncontrolled."  (R. at 377, 388, 449, 822.)  As of December 2013, Plaintiff was taking prescription medications including Humalog, an insulin injection, to manage her diabetes (R. at 377.)  In November 2016, Plaintiff's endocrinologist noted that she was "getting fatigued of the shots" and missing one of her two Humalog treatments daily.  (R. at 822; *see also id.* at 830 (noting in March 2017 Plaintiff's "lack of adherence to insulin therapy").)

**2.    Vision Problems**

At the August 2017 hearing, Plaintiff testified that poor vision is one of the main reasons she cannot work in any job.  (R. at 55.)  According to medical records, she began complaining of blurry vision in July 2015 during a visit to an optometrist, Dr. Byron Wright.  (R. at 453.)  Dr. Wright diagnosed her with background diabetic retinopathy, hypertensive retinopathy, vitreomacular adhesion of the left eye, and asymmetry of the right optic nerve.  (R. at 453-55.)[5]  He characterized

---

[3]    "BMI is the ratio of an individual's weight in kilograms to the square of her height in meters."  (R. at 24 n.1.)

[4]    "Type 2 diabetes is a chronic condition that affects the way your body metabolizes sugar . . . . [I]t develops when the body becomes resistant to insulin or when the pancreas is unable to produce enough insulin."  *Type 2 Diabetes*, Mayo Clinic, *https://www.mayoclinic.org/diseases-conditions/type-2-diabetes/symptoms-causes/syc-20351193* (last visited Dec. 29, 2020).  Type 2 diabetes can affect "many major organs, including your heart, blood vessels, nerves, eyes and kidneys."  *Id.*

[5]    Diabetic retinopathy "is a diabetes complication that affects eyes.  It's caused by damage to the blood vessels of the light-sensitive tissue at the back of the eye (retina)."  *Diabetic Retinopathy*, Mayo Clinic, *https://www.mayoclinic.org/diseases-conditions/diabetic-retinopathy/symptoms-causes/syc-20371611* (last visited Dec. 29, 2020).  Diabetic retinopathy can cause

the retinopathy condition in both eyes as "mild" and advised Plaintiff to return "if symptoms of decreased vision or increased flashing lights or floaters occur." (R. at 455.) In January 2016, Dr. Wright referred Plaintiff to Dr. Mohamed Adenwalla, a retina specialist, who noted that Plaintiff has "blurred vision" of "moderate" severity. (R. at 621.) Dr. Adenwalla diagnosed proliferative diabetic retinopathy, vitreous hemorrhage, and diabetic macular edema in both eyes. (R. at 622.)[6] Dr. Adenwalla concluded that the diabetic macular edema was stable, but his examination revealed attenuated retinal vessels and "scattered retinal hemorrhages" in both of Plaintiff's eyes. (*Id.*) In June 2016, Dr. Adenwalla observed that Plaintiff had both a "new" and an "improving" vitreous hemorrhage. (R. at 782). He performed panretinal photocoagulation ("PRP"), a laser procedure, to treat diabetic retinopathy in her right eye. (*Id.*)

Plaintiff visited Dr. Adenwalla twice in October 2016, still complaining of blurry vision. (R. at 776, 779.) Dr. Adenwalla again noted that Plaintiff's diabetic macular edema was stable but diagnosed her with neovascularization of the iris ("NVI") and treated the condition with eye

---

symptoms including "[s]pots or dark strings floating in your vision (floaters)," blurry vision, and blindness. *Id.* Hypertensive retinopathy occurs when high blood pressure damages the blood vessels in the retina. *High Blood Pressure and Eye Disease*, webmd.com, *https://www.webmd.com/hypertension-high-blood-pressure/guide/eye-disease-high-blood-pressure* (last visited Dec. 29, 2020). Vitreomacular adhesion occurs when "the vitreous, or the jelly-like substance that fills the eyeball," sticks to the macula, "a small area on the retina responsible for the central part of your field of vision." *What Is Vitreomacular Adhesion (VMA)?*, webmd.com, *https://www.webmd.com/eye-health/qa/what-is-vitreomacular-adhesion-vma* (last visited Dec. 29, 2020).

[6]     Vitreous hemorrhage is a complication that can present with diabetic retinopathy. *Diabetic Retinopathy*, Mayo Clinic, *https://www.mayoclinic.org/diseases-conditions/diabetic-retinopathy/symptoms-causes/syc-20371611* (last visited Dec. 29, 2020). It occurs when abnormal blood vessels grow in the retina and "bleed into the clear, jelly-like substance that fills the center of your eye." *Id.* In severe cases, "blood can fill the vitreous cavity and completely block your vision." *Id.* Diabetic macular edema, too, can present with diabetic retinopathy. It occurs when fluid causes swelling (edema) in the central part of the retina (macula), and it can "cause vision problems or blindness." *Diabetic Macular Edema*, Mayo Clinic, *https://www.mayoclinic.org/diseases-conditions/diabetic-retinopathy/multimedia/diabetic-macular-edema/img-20124558* (last visited Dec. 29, 2020).

injections. (R. at 777, 780.)[7] In November 2016, Plaintiff complained of blurry vision to her endocrinologist. (R. at 822.) Dr. Adenwalla treated her left eye with injections for diabetic macular edema that month. (R. at 773-74). He also observed vitreous hemorrhage, attenuated retinal vessels, blot hemorrhages in the macula, and scattered retinal hemorrhages in Plaintiff's left eye. (R. at 774.) In December 2016, Dr. Adenwalla observed these same problems, again in Plaintiff's left eye, and performed PRP treatment on both eyes for diabetic retinopathy. (R. at 767-68, 770-71.) In February 2017, Dr. Adenwalla observed attenuated retinal vessels, blot hemorrhages in the macula, and scattered retinal hemorrhages in both of Plaintiff's eyes, plus vitreous hemorrhage in her left eye. (R. at 765.) He performed PRP treatment on the left eye. (*Id.*) In March 2017, Plaintiff again complained of blurry vision to her endocrinologist. (R. at 827.) Dr. Adenwalla performed PRP treatment on her right eye in March 2017 (R. at 762) and her left eye in April 2017. (R. at 759.) At most visits between July 2016 and March 2017, Dr. Adenwalla noted that Plaintiff had not reported flashes, floaters, shadows, curtains, or distorted vision. (R. at 758-86.) But in October 2016, he noted that Plaintiff reported having floaters in her left eye for three to five months. (R. at 776, 779.) And he stated in every treatment note that his goals included stabilizing Plaintiff's vision. (R. at 758-86.)

### 3. Finger, Hand, and Wrist Problems

In a September 2015 physical impairment questionnaire provided to the SSA, Plaintiff wrote that she was having trouble opening jars, using can openers, and sorting paperwork because of stiffness in her hands and "problems opening [her] hands." (R. at 289.) In November 2015, Plaintiff visited an internist, Dr. Gabrielle Mykoniatis, and complained that she had been

---

[7] Plaintiff states that NVI occurs "when small fine, blood vessels develop on the anterior surface of the iris in response to retinal ischemia." (Pl. Br. at 2 n.4 (quoting Johanna Beebe, MD & Jaclyn Haugsal, MD, *Rubeosis Iridis or Neovascularization of the Iris in Diabetes*, Univ. of Iowa Health Care, *http://webeye.ophth.uiowa.edu/eyeforum/atlas/pages/NVI/index.htm* (last visited Dec. 29, 2020).)

experiencing trigger finger for several months. (R. at 585.)[8] Plaintiff said that the middle and ring fingers on her left hand were "locking up" and interfering with activities like opening jars. (*Id.*) Dr. Mykoniatis referred her to an orthopedic surgeon, Dr. John Kung, who examined Plaintiff in December 2015. (R. at 551-52, 586.)[9] At that point, Plaintiff was experiencing pain in both hands. (R. at 551.) Dr. Kung noted that Plaintiff's left-hand muscle strength, tone, and stability were normal and that, regarding her right hand, pulses were normal, motors in the fingers were "intact", and there was no "instability". (R. at 552.) (*Id.*) He observed, however, that Plaintiff was feeling tenderness in her right-hand fingers, and diagnosed trigger finger in the right ring and middle fingers. (*Id.*) He gave her a steroid injection in the right middle finger that day. (*Id.*)

In September 2016, Plaintiff visited Dr. Benjamin Stumpf, a family medicine physician, and reported that she had been having pain and swelling in her left wrist for about two weeks. (R. at 737.) She stated the swelling became worse with movement and better with rest. (*Id.*) Dr. Stumpf diagnosed a sprained wrist. (R. at 740.) Plaintiff returned in October 2016, still experiencing pain in her left wrist. (R. at 741.) Dr. Stumpf observed edema (swelling caused by trapped fluid) in Plaintiff's left forearm and noted that Plaintiff felt "pain with flexion/extension of wrist." (R. at 743.) He advised Plaintiff to return to the hand surgeon. (*Id.*) There is no evidence that Plaintiff did so. She testified at the administrative hearing that she continues to have problems with her fingers. (R. at 63.)

### 4. Depression and Mental Restrictions

In an August 2015 visit to Dr. Mykoniatis, Plaintiff complained of stress and "daytime

---

[8] "Trigger finger is a condition in which one of your fingers gets stuck in a bent position. Your finger may bend or straighten with a snap—like a trigger being pulled and released." *Trigger Finger*, Mayo Clinic, *https://www.mayoclinic.org/diseases-conditions/trigger-finger/symptoms-causes/syc-20365100* (last visited Dec. 29, 2020).

[9] The court assumes that Dr. Mykoniatis' first reference to left-hand trigger finger was a typographical error because she referred Plaintiff to Dr. Kung for right-hand trigger finger. (R. at 586.)

somnolence." (R. at 460.)  Although Plaintiff showed "[n]ormal judgment and insight," and her memory, mood, and affect were normal, Dr. Mykoniatis noted that she suffered from depression. (R. at 460, 461.)  In a function report provided to the SSA that month, Plaintiff wrote that she "sometimes forget[s] [her] appointments." (R. at 284.)  She also reported that she has "difficulty concentrating"; can pay attention for only "about 10 minutes"; has "memory problems", making her ability to follow spoken instructions "very poor"; and does not handle stress or changes in routine well. (R. at 285-86.)

Dr. Piyush Buch, a psychiatrist and SSA consultative examiner (R. at 21, 91), examined Plaintiff in October 2015. (R. at 545.)  According to Dr. Buch, Plaintiff reported having "a history of suffering from depression due to her health issues", having "increased feelings of sadness and hopeless and helpless feelings", and losing "interest and pleasure in things she used to enjoy." (*Id.*)  She also reported feeling increasingly agitated, irritable, and worthless, and that she was experiencing loss of energy, motivation, and "decreased ability to think or make decisions." (*Id.*) Plaintiff denied "any suicidal ideations or plans", however. (*Id.*)  Dr. Buch observed that Plaintiff made "good eye contact", was cooperative, and "gave relevant answers." (*Id.* at 546.)  He also observed that her "memory was average" and her attention, concentration, intelligence, general knowledge, abstract thinking, and social judgment were good. (*Id.*)  And he stated that Plaintiff "was able to understand, remember, and carry out instructions." (*Id.*)  He also observed, however, that Plaintiff's "affect was depressed throughout the examination," and he diagnosed "adjustment disorder with depressed mood." (*Id.*)  Dr. Mykoniatis' notes from a visit with Plaintiff the next month state that Plaintiff "denie[d] depression or anxiety." (R. at 585.)  In September 2016, October 2016, January 2017, and March 2017, however, family medicine physicians listed depression among Plaintiff's "active" medical conditions. (R. 738, 742, 751, 754.)

In a third-party function report provided to the SSA in August 2015, Plaintiff's son wrote that Plaintiff "sometimes forgets to take medications", can pay attention only for about ten minutes, and "forgets most things after she is told." (R. at 309, 312.)

7

### 5. Other Conditions

Plaintiff has a history of other medical conditions, including asthma, hypertension (high blood pressure), obstructive sleep apnea, and edema in the legs. (R. at 21, 110.) Because these conditions are not central to Plaintiff's challenge to the RFC determination, the court does not discuss them.

### B. Initial Review and Reconsideration

At the initial level of review in October 2015, non-examining SSA review doctors opined that Plaintiff had severe obesity, asthma, and diabetes mellitus. (R. at 90.) They considered her glaucoma,[10] hypertension, and affective disorders to be "non-severe." (*Id.*) According to the review doctors, Plaintiff's affective disorders included "mild" difficulties in maintaining social functioning, concentration, persistence, or pace. (*Id.*) The review doctors also determined that she could lift 50 pounds occasionally and 25 pounds frequently, and sit, stand, or walk for "6 hours in an 8-hour workday." (R. at 92-93.) Finally, they determined that she had no postural, manipulative, or visual limitations, but that she should "avoid concentrated exposure" to "fumes, odors, dusts, gases, and poor ventilation . . . due to history of asthma." (R. at 93.)

At the reconsideration level in February 2016, non-examining SSA review doctors opined that Plaintiff's obesity, asthma, diabetes mellitus, and retinal disorders (including diabetic retinopathy) were severe, whereas her glaucoma, hypertension, and affective disorders were non-severe. (R. at 116.) Regarding Plaintiff's affective disorders, the review doctors noted that at medical appointments in August, September, November, and December 2015, Plaintiff either denied depression or anxiety or showed no symptoms of those conditions. (R. at 117.) They determined that Plaintiff did not have any visual or manipulative limitations, but is limited to lifting

---

[10] "Glaucoma is a group of eye conditions that damage the optic nerve, the health of which is vital for good vision." *Glaucoma*, Mayo Clinic, *https://www.mayoclinic.org/diseases-conditions/glaucoma/symptoms-causes/syc-20372839* (last visited Dec. 29, 2020). Plaintiff does not challenge any of the administrative findings concerning glaucoma, as distinct from her other vision problems, so the court does not discuss them further.

20 pounds occasionally, 10 pounds frequently, and sitting, standing, and walking for six hours in a workday. (R. at 119-20.) They determined, further, that Plaintiff had postural limitations (for example, she could never climb ladders, ropes, or scaffolds), and should "avoid even moderate exposure" to hazards like machinery and heights. (R. at 119-20.)

## C. Plaintiff's Testimony

### 1. Medical History

At the August 2017 hearing, Plaintiff gave detailed testimony about her vision problems. She explained that at times, a "film comes over [her] eyes." (R. at 55.) "It's like seeing out of a fog", she said. (*Id.*) At the outset of each blurry vision episode, Plaintiff testified, she sees "black wiggly things . . . and then the filmy [sic] start." (R. at 64.) She can see blood "spill into [her] eye", and then her vision becomes blurred. (*Id.*) At that point, Plaintiff testified, her vision is so poor that she cannot see "cracks in the table" or people's faces, even on a "pretty big TV screen." (*Id.*) Nor can she see well enough to use a phone or computer. (R. at 55, 64.) She has even "walked into a couple of walls." (R. at 73.) Plaintiff's blurry vision usually lasts "for two to three weeks", clears up, and then returns "after about a week or so", she explained. (R. at 64.) According to Plaintiff, these episodes have occurred every month since the end of 2015. (R. at 73-74.) She testified that she had to stop receiving treatments from Dr. Adenwalla because her insurance "dropped" him from coverage, but she is searching for a new doctor. (R. at 65.)

Plaintiff also testified that she is still having problems with her fingers. She explained that "[t]hey don't bend" or fold properly, which makes it difficult to grasp objects. (R. at 63.) In addition, Plaintiff testified that she has had "a short-term memory problem" since 2010. (R. at 66.) She explained that she can have a conversation in the morning "and then by the afternoon, [she] will have totally forgotten . . . what was said." (*Id.*) Plaintiff conceded that none of her doctors has "made any type of diagnosis or finding about the memory problems." (R. at 66-67.) But she testified that she has not "talked to [her] doctors at length" about her memory problems because she "really wasn't thinking about it. It's something that . . . I saw more so while I was working."

(R. at 67.)  Finally, she testified that she has not taken prescription medication, visited the hospital, or received treatment for mental health issues.  (R. at 57.)

### 2.  Work History

Plaintiff provided testimony about her work history, as well.[11]  Regarding her past employment as a check writer, Plaintiff stated that she had to lift trays of checks that weigh between 30 and 50 pounds.  (R. at 46.)  In her past work as a data entry clerk, she was responsible for filing paperwork and taking meeting minutes, and in a similar role, she was responsible for organizing files that weigh up to 50 pounds.  (R. at 52-53.)  Plaintiff testified that she has tried to work in temporary clerical jobs every year since June 2011, but was "let go" because she "couldn't keep up . . . at the fast pace" those jobs now require.  (R. at 54-55, 67.)  According to Plaintiff, her last attempt at temporary work was unsuccessful because "my eyes were getting bad.  I just was not able to see the computer screen well enough to be functional."  (R. at 55.)  She added that her medications make her dizzy and she lacks the energy to get up, catch a bus to work, or move around quickly at work.  (R. at 72; *see also id.* at 69 (testifying that she can walk only about half a block before she experiences shortness of breath).)

### 3.  Day-to-Day Activity

Plaintiff testified that she lives alone but receives frequent assistance from her children who live nearby.  (R. at 55.)  She has a driver's license but "tr[ies] not to drive" because of her vision problems.  (R. at 56.)  In 2015, one of Plaintiff's daughters moved into an apartment a few blocks away in order to drive Plaintiff to medical appointments and help with household chores like cleaning and washing dishes, which have become increasingly challenging for Plaintiff because of her breathing problems.  (R. at 55-56, 62, 69.)  Plaintiff testified that she shops in stores and attends church, but only "when [she] can get transportation."  (R. at 62.)  And although

---

[11]    The court omits Plaintiff's testimony about her past employment as a meter reader and switchboard operator because the ALJ determined that, due to her limitations, she cannot work in those jobs.  Thus, those jobs are not relevant for present purposes.

10

Plaintiff can cook simple meals, she does not "like to create a lot of dishes" because she "can't stand up to the sink for long periods of time." (*Id.*)  Plaintiff's older son stops by several times a week to help with yardwork and other chores she can no longer complete.  (R. at 55-56.)  In a January 2016 function report provided to the SSA, Plaintiff wrote that on a typical day, she listens to tapes for Bible study, tries to walk "if weather permits", and watches DVDs.  (R. at 330, 333.)

### D.    Vocational Expert Testimony

The Dictionary of Occupational Titles ("DOT") defines jobs in the national economy.  It defines a check writer as someone who "[i]mprints payment data on checks, records payment details on check register, using check-writing machine, and compiles summaries of daily disbursements."  DOT 219.382-010, 1991 WL 671976.  Completing these duties requires, among other things, selecting the appropriate "check register form" to insert into the check-writing machine, "[c]omparing register total with total on adding-machine tape to verify accuracy of register totals," and "[c]orrecting errors or return[ing] vouchers to other personnel for correction." *Id.*  The DOT defines a general clerk as someone who "[p]erforms any combination of" enumerated and similar clerical duties, including writing, typing, or entering information into a computer, "[c]opying information from one record to another," proof-reading records or forms, and sorting and filing records.  DOT 209.562-010, 1991 WL 671792.

Sara Gibson, a vocational expert, testified at the hearing about DOT classifications for Plaintiff's past jobs as she performed them.  According to Ms. Gibson, employment as a check writer is classified as sedentary with medium physical demands as performed by Plaintiff, and employment as a general clerk is classified as "light per the DOT, medium as performed" by Plaintiff.  (R. at 75.)  The ALJ presented several hypothetical scenarios to Ms. Gibson for purposes of determining which past jobs, if any, Plaintiff can still do.  Four scenarios are relevant here. First, the ALJ inquired whether a person of Plaintiff's age, education, and work experience—who is limited to a light exertional level and "can handle and finger frequently bilaterally"—could work in any of Plaintiff's past jobs.  (R. at 76.)  Ms. Gibson opined that a person in those circumstances

11

could work as a check writer and general clerk. (*Id.*) Second, the ALJ asked whether the same person could perform those jobs if she were capable of no more than "frequent" (rather than constant) "near acuity." (R. at 77.) Ms. Gibson answered yes. (*Id.*) Third, the ALJ asked whether the person could do any of Plaintiff's past work, even at the sedentary level, if she were "limited to handling and fingering only occasionally." (*Id.*) Ms. Gibson answered no. (*Id.*) Fourth, the ALJ asked whether the person could do any of Plaintiff's past work—or any sedentary work at all—if she were limited to "frequent" handling and fingering, and had only "occasional" capability of performing tasks requiring "near acuity." (*Id.*) Ms. Gibson answered no. She added that if a person, regardless of her functional capacity, were "off task" for more than 15 percent of an eight-hour workday or would miss one-and-a-half or more days of work each month, there would be no work for her in the national economy. (R. at 78.) Plaintiff's attorney asked Ms. Gibson why employment as a check writer or general clerk would not "require constant near acuity." (R. at 79.) Ms. Gibson answered that "per the DOT," constant near acuity is not required for those jobs. (*Id.*)

## DISCUSSION

### A.  Legal Framework

The Social Security Act authorizes judicial review of final decisions of the Commissioner of Social Security. *See* 42 U.S.C. § 405(g). Because the Appeals Council denied Plaintiff's request for review, the final decision in this case was the ALJ's decision to deny benefits. *See Thompson v. Berryhill*, 722 F. App'x 573, 579 (7th Cir. 2018).

On appeal, this court considers whether the ALJ's findings were supported by substantial evidence, 42 U.S.C. § 405(g), and whether the ALJ's decision is "the result of an error of law." *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012) (internal quotation marks omitted). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks omitted). In reviewing the ALJ's decision, the court may not "reweigh evidence,

resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal quotation marks omitted). The court's review is deferential, but it is not intended to "rubber-stamp" the ALJ's decision. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). The court considers whether the ALJ has built "an accurate and logical bridge" between the evidence and his conclusion. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (internal quotation marks omitted); *see also Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014) (the court should "conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues") (internal quotation marks omitted).

A person is "disabled" under the Social Security Act if she is unable to engage in "substantial gainful activity" due to a medically determinable physical or mental impairment. 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is construed broadly; to be deemed disabled, the claimant must show she is "not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

To determine whether a given claimant is disabled, the ALJ follows the five-step, sequential process described in 20 C.F.R.§§ 404.1520, 416.920. Specifically, the ALJ determines (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether she has a severe impairment (or combination of severe impairments); (3) if so, whether the impairment (or combination of impairments) is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy given her RFC, age, education, and work experience. *See, e.g.*, *Cerentano v. UMWA Health & Ret. Funds*, 735 F.3d 976, 980 (7th Cir. 2013) (citing 20 C.F.R.§ 404.1520).

**B.      The ALJ's Decision**

13

On January 31, 2018, the ALJ issued his decision, concluding that Plaintiff was not disabled from June 1, 2011 through March 31, 2017. At step one, he determined that Plaintiff meets the insured status requirement of the Social Security Act through March 31, 2017 and that she has not engaged in substantial gainful activity since June 1, 2011. (R. at 20-21.) At step two, he determined that Plaintiff has five severe impairments: diabetes mellitus, retinal disorder, asthma, obstructive sleep apnea, and obesity. (R. at 21.) He determined, further, however, that Plaintiff's depression, glaucoma, hypertension, pulmonary hypertension, and right-hand trigger finger are not severe and result in no "more than minimal functional limitations," either independently or in combination. (*Id.*) Regarding Plaintiff's trigger finger, he observed that "examination findings in 2015 revealed normal pulses, intact motor function and sensation and no instability." (*Id.*) He also noted that "treatment notes in 2016 indicate [Plaintiff] had not seen a hand specialist in a couple of months." (*Id.*)

Turning to Plaintiff's depression, the ALJ noted that the medical evidence and Plaintiff's testimony show "no history of psychiatric hospitalizations," outpatient treatment, counseling, or medication for depression. (R. at 21-22.) He also cited Dr. Buch's findings in the October 2015 consultative examination: that Plaintiff had a "depressed affect" but was "fully oriented and cooperative", displayed "good" attention, concentration, abstract thinking, and social judgment, and displayed "average" memory. (*Id.*) Under the so-called Paragraph B criteria of the Social Security Act's mental impairment listings, the ALJ determined that Plaintiff has no limitation in "understanding, remembering, or applying information." (R. at 22.) In support, he observed that Plaintiff still has a driver's license and can, among other things, operate a cell phone, handle a savings account, provide information about her health, follow doctors' instructions, and describe prior work history. (*Id.*) The ALJ also determined that Plaintiff has no limitation in "interacting with others" and "adapting or managing" herself. (R. at 22-23.) He recognized that Plaintiff has a "limitation in the area of concentration, persistence, or maintaining pace", but found the limitation only mild because (1) Plaintiff has not seen a doctor about her memory problems and (2) the

"evidence shows [she] is able to concentrate sufficiently to listen to tapes for Bible study and watch DVDs and movies." (R. at 22.) (*Id.*) The ALJ "afford[ed] great weight to the State agency mental consultants' findings that [Plaintiff's] mental impairments [are] non-severe." (R. at 23.) Overall, he concluded that Plaintiff's depression causes no "more than minimal limitation in [her] ability to perform basic mental work activities." (R. at 21.)

At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that the Social Security Act classifies as conclusively disabling. (R. at 23.) Between steps three and four, he determined that Plaintiff has the RFC to perform "light work" with certain limitations. (R. at 25.) Most relevant here, he concluded that Plaintiff can "handle and finger frequently bilaterally" and is capable of jobs requiring "frequent near acuity." (*Id.* at 25, 28.)[12] In determining Plaintiff's RFC, the ALJ first stated that her "medically determinable impairments"—including diabetes, asthma, and retinal disorders—"could reasonably be expected to produce" the symptoms she complains of, including blurred vision, edema in the legs, low energy, dizziness, and difficulty walking more than half of a block. (*Id.*) But according to the ALJ, Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 26.)

Addressing Plaintiff's vision problems, the ALJ acknowledged her diagnoses of bilateral retinopathy and vitreomacular adhesion of the left-eye macula. (R. at 26.) Likewise, he noted that Plaintiff has received "laser treatments and injections due to vitreous hemorrhaging in both eyes." (*Id.*) But the ALJ concluded that "the objective medical evidence does not fully support the extreme limitations alleged by" Plaintiff. (*Id.*) Specifically, he pointed out that (1) Plaintiff's "retinopathy was noted to be mild and non-proliferative and her corrected distance acuity was

---

[12]     He also concluded that Plaintiff "can climb ramps and stairs frequently; never climb ladders, ropes and scaffolds; [can] balance, stoop, kneel, crouch and crawl on a frequent basis;" and "can only occasionally work in hazardous environments . . . ." (*Id.* at 25.)

20/50 on the right and 20/25 on the left"; (2) her "diabetic macular edema in the right eye was noted to be stable"; and (3) Plaintiff "often denied flashes, floaters, curtains, shadows, or distortion of vision at medical appointments, which conflicts with her allegations of blurred vision and seeing 'black wiggly things.'" (*Id.*) The ALJ afforded "great weight" to the "State agency ophthalmology consultants' opinion at the reconsideration level" about Plaintiff's functional limitations. (R. at 29.)

The ALJ also concluded that Plaintiff suffered only from mild peripheral neuropathy (R. at 27)—a condition resulting from nerve damage that can cause weakness, numbness, and pain, usually in the hands and feet.[13] Although medical records state that Plaintiff suffers from peripheral neuropathy, the ALJ stated, her "neurological exams were generally intact" and there is "no evidence of any electromyogram/nerve conduction studies supporting the diagnosis." (R. at 27.) Moreover, Plaintiff "often denied paresthesia[14] or focal weakness, joint stiffness, warmth or loss of range of motion at medical examinations." (R. at 27.)[15]

In the ALJ's view, Plaintiff's "activities of daily living are not limited to the extent" she has alleged, in light of her capabilities documented in the record. (R. at 28.) For example, she lives alone, has a driver's license, handles a savings account, does laundry, cooks meals, and uses a cell phone. (*Id.*) Plaintiff's physician also "recommended [she] increase her exercise." (*Id.*) According to the ALJ, this "suggests the physician believed [she] was capable of doing more than

---

[13] *See Peripheral Neuropathy*, Mayo Clinic, *https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061* (last visited Dec. 29, 2020). As far as the court can tell, the ALJ combined the analysis of how trigger finger and peripheral neuropathy affect Plaintiff's ability to use her hands and fingers.

[14] "Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body." *Paresthesia Information Page*, Nat'l Institute of Neurological Disorders and Stroke, *https://www.ninds.nih.gov/ Disorders/All-Disorders/Paresthesia-Information-Page* (last visited Dec. 29, 2020).

[15] The ALJ also determined that the evidence concerning asthma, obstructive sleep apnea, obesity, and lower-extremity edema shows that the conditions are not as limiting as Plaintiff claims. (R. at 25-28.) The court omits the details of this discussion because Plaintiff does not challenge the RFC determination as it relates to those conditions.

she reported." (*Id.*)  Finally, the ALJ noted that Plaintiff "has worked since the alleged onset date" of her disabilities.  (*Id.*)  He concluded she is capable of "light exertional work."  (R. at 28.) "Accounting more specifically for her diabetes mellitus with associated retinopathy," the ALJ stated, Plaintiff is capable of work requiring "frequent near acuity. . . ."  (*Id.*)  And due to her "diabetes with mild peripheral neuropathy, she can handle and finger frequently bilaterally."  (*Id.*)

At step four, the ALJ compared Plaintiff's RFC with the physical and mental demands of her past relevant work.  (R. at 30.)  He determined that Plaintiff can perform work as an office associate/check writer and general clerk as generally performed in the national economy.  (*Id.*) Thus, he concluded that Plaintiff was not disabled as defined in the Social Security Act between June 1, 2011 and March 31, 2017.  (R. at 30-31.)

## C.    Analysis

### 1.    RFC Determination

Plaintiff contends that the ALJ did not properly account for her visual, manipulative, and mental limitations in determining her RFC.  The court addresses each argument in turn.

#### a.    Visual Limitations

The ALJ determined that Plaintiff could perform light work requiring frequent use of "near visual acuity".  Plaintiff disputes this conclusion, arguing that "[t]he ALJ did not explain how he determined that [her] vision problems" were mild enough that she is capable of jobs requiring "frequent—as opposed to rare or occasional—near acuity . . . ." (Pl. Br. at 6.)  The Social Security Administration defines "frequent" (as it relates to a person's ability to perform work) to mean "occurring from one-third to two-thirds of the time."  Program Policy Statement, Titles II & XVI: Defining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2, SSR 83-10 (S.S.A.), 1983–1991 Soc. Sec. Rep. Serv. 24, 1983 WL 31251, at *6 ("SSR 83-10"). "Occasionally" means "occurring from very little up to one-third of the time."  *Id.* at *5.  The court understands Plaintiff to be arguing that the ALJ did not explain how the evidence supports a conclusion that she can use "near visual acuity" for one to two-thirds of a workday.  As discussed

here, the court agrees.

At the reconsideration level, the SSA review doctors determined that Plaintiff's retinal disorders, including diabetic retinopathy, were severe.  (R at 116.)  The ALJ, too, classified Plaintiff's retinal disorders as severe and determined they could produce the symptoms Plaintiff describes.  (R at 21, 25.)  He also acknowledged evidence regarding the treatments Plaintiff received and her symptom-related testimony.  Yet he concluded that the functional limitations resulting from Plaintiff's vision problems are not as severe as she claims, and that she can perform light work requiring frequent use of near visual acuity, because (1) some medical records describe her diabetic retinopathy as "mild and non-proliferative"; (2) some medical records describe her diabetic macular edema in the right eye as "stable"; and (3) Plaintiff "often denied flashes, floaters, curtains, shadows, or distortion of vision at medical appointments."  (R. at 26.)  The ALJ also suggested that Plaintiff's distance vision is adequate when "corrected", which the court assumes is a reference to use of prescription lenses.  (*Id.*)

Reasonable minds would not accept this evidence as adequate to support the ALJ's RFC determination.  It is true that Dr. Wright described Plaintiff's diabetic retinopathy as mild in 2015 (R. at 455) and that Dr. Adenwalla repeatedly described Plaintiff's diabetic macular edema as stable.  (*See, e.g.*, R. at 759, 782)[16]  These descriptions alone, however, do not support the ALJ's determination that Plaintiff can perform light work that frequently requires her to use near visual acuity.  *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (doctor's "hopeful remarks" in treatment notes for a plaintiff with bipolar disorder, including that the plaintiff was doing "fairly well" and "quite well", did not warrant discounting the doctor's opinion that the plaintiff could not work

---

[16]     The only reference to "non-proliferative" diabetic retinopathy that the court found in the record was made by Plaintiff's endocrinologist.  (*See* R. at 705.)  The court disregards that description, because it conflicts with the diagnosis of proliferative diabetic retinopathy made by Dr. Adenwalla, a retina specialist.  (R. at 785.)  In any event, the ALJ did not explain why non-proliferative versus proliferative diabetic retinopathy would affect Plaintiff's ability to frequently use near visual acuity.

full time); *Harper v. Berryhill*, No. 16 C 5075, 2017 WL 1208443, at *9 (N.D. Ill. Apr. 3, 2017) ("[C]ourts have repeatedly held that 'a person can have a condition that is both 'stable' and disabling at the same time.'" (quoting *Hemminger v. Astrue*, 590 F. Supp. 2d 1073, 1081 (W.D. Wis. 2008))). Dr. Wright is not a retina specialist, and Dr. Adenwalla, who is, did not describe Plaintiff's diabetic retinopathy as mild. It was at least serious enough for him to treat her with PRP laser therapy between June 2016 and August 2017. (*See* R. at 759, 762, 765, 767-68, 770-71, 782). Similarly, although Dr. Adenwalla described Plaintiff's diabetic macular edema as "stable", he treated it with injections in November 2016. (R. at 773-74.) Dr. Adenwalla also noted at every visit that his treatment goal was to stabilize Plaintiff's vision. (R. at 758-86.) In this regard, it is significant that diabetic retinopathy and diabetic macular edema are only two of Plaintiff's numerous diagnosed retinal disorders; the others include vitreomacular adhesion of the left eye, hypertensive retinopathy, asymmetry of the right optic nerve, and neovascularization of the iris. (R. at 453-55, 776-77.) Equally significant, Dr. Adenwalla described Plaintiff's blurry vision as moderate in severity (R. at 621), and during examinations of both eyes, he frequently observed scattered retinal hemorrhages, vitreous hemorrhages, attenuated retinal vessels, and blot hemorrhages in the macula. (R. at 774, 765, 768, 771, 782.)

This objective medical evidence shows that Plaintiff's retinal disorders are symptomatic and that her vision is not "stable", even if her diabetic macular edema is. Accordingly, the ALJ's use of the words "mild" or "stable" to describe two of Plaintiff's myriad retinal disorders does not satisfy the court that he has built an adequate and logical bridge to the conclusion that Plaintiff can use frequent near visual acuity in the workplace. The ALJ's failure to explain why limiting Plaintiff to occasional or rare acuity would not better accommodate her symptoms only adds to the problem.

To the extent the ALJ based his opinion on findings by SSA review doctors at the reconsideration stage, it bears mention that those findings also defy logic: the SSA review doctors stated that Plaintiff's retinal disorders (including diabetic retinopathy) were severe, yet determined

without explanation that she lacked *any* visual limitations. (R. at 116, 120.) Furthermore, they rendered their opinion in February 2016, but the medical records show that Plaintiff sought treatment for her retinal disorders well into 2017—when, according to Plaintiff, her insurance plan stopped covering Dr. Adenwalla. (R. at 65.) The ALJ evaluated the post-February 2016 medical records without input from any doctor. This, too, detracts from his conclusion that Plaintiff can use frequent near visual acuity. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.").

Plaintiff's recurring complaints about blurred vision are significant, as well. Plaintiff first reported blurry vision in 2015 and repeatedly raised the same complaint throughout 2016 and 2017. (*See, e.g.*, R. at 453, 621, 822, 827). At the administrative hearing, Plaintiff testified that she experiences blurry vision every month for two to three weeks at a time and that these prolonged and recurring episodes directly affect her ability to function. (R. at 55, 64-65, 73-74.) For example, she cannot see well enough to use a phone or computer, and her vision is so bad that she sometimes walks into walls. If this testimony is true, Plaintiff's "corrected" distance acuity (R. at 26) assists her only in the one to two weeks per month when her vision is clear.

In "determin[ing] the extent to which an individual's symptoms limit . . . her ability to perform work-related activities," the ALJ "must consider whether [her] statements about the intensity, persistence and limiting effects of . . . her symptoms are consistent with the medical signs and laboratory findings of record." Social Security Ruling (SSR) 16-3p, 2017 WL 5180304, at *4-5. In this case, the ALJ discounted Plaintiff's testimony about blurry vision because she "often denied flashes, floaters, curtains, shadows, or distortion of vision at medical appointments, which conflicts with her allegations of blurred vision and seeing 'black wiggly things.'" (R. at 26.) But he ignored the fact that in October 2016, Plaintiff told Dr. Adenwalla that she had been seeing floaters in her left eye for three to five months. (R. at 779.) Nor is it clear that blurred vision is equivalent to flashes, floaters, curtains, shadows, or distorted vision. Plaintiff repeatedly reported

blurry vision to her doctors; Dr. Adenwalla characterized her blurry vision as moderate in severity; and according to Plaintiff's testimony, blurry vision is the symptom that causes severe visual limitations for up to three weeks every month. Moreover, Plaintiff's testimony that she can see blood spilling into her eyes during her episodes of blurry vision is consistent with the diagnosis of vitreous hemorrhage. This evidence undermines the ALJ's conclusion that Plaintiff's testimony about the severity of her blurry vision and its impact on her functioning is not credible—and the ALJ cited no other evidence to support that conclusion.

If the ALJ discounted Plaintiff's testimony on the basis that she can live alone and complete certain household chores, he did not adequately draw that connection, either. Namely, he did not explain why Plaintiff's capabilities translate into an ability to perform work requiring frequent, as opposed to occasional or rare, near visual acuity—especially considering the frequent assistance Plaintiff receives from her children. *See Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) (stating that "difficulty functioning independently in the workplace does not necessarily translate to the same level of difficulty in the home," and faulting the ALJ for failing to address the assistance the plaintiff received from her children to complete household chores); *see also Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (similar). And although Plaintiff has attempted temporary employment since the alleged onset of her disabilities, she testified that she lost every temporary job because of her medical conditions, most recently because of her poor vision. (R. at 54-55, 67.) The ALJ nowhere suggests that this testimony is not credible.

The court gives "special deference" to the ALJ's credibility determinations, *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017), but only so long as he "consider[s] the claimant's level of pain, medication, treatment, daily activities, and limitations . . . and justif[ies] the credibility finding with specific reasons supported by the record." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Here, he did not, and his decision to discount Plaintiff's testimony about the severity of her blurry vision was patently inconsistent with the overall record.

Considering that record, the court cannot identify "an accurate and logical bridge" between

21

the three categories of evidence the ALJ relied upon and his determination that Plaintiff can use frequent, as opposed to occasional or rare, near visual acuity. *Jeske*, 955 F.3d at 587. As Plaintiff notes, the ALJ's error was not harmless because the vocational expert testified that if an individual with Plaintiff's background were limited to light work and frequent handling and fingering—but could exercise near visual acuity only occasionally—there would be no work for her in the national economy. (*See* Pl. Br. at 6 (citing R. at 77).)

Defendant responds that the court should affirm the ALJ's visual RFC determination because "[t]here is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'" (Def. Mem. in Supp. of Mot. for Summ. J. ("Def. Mot.") [21] at 4 (quoting *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004))).) True, Plaintiff's treating doctors did not opine on her functional visual limitations for purposes of her Social Security application. But for the reasons already explained, their contemporaneous treatment notes—which contain not only Plaintiff's descriptions of her symptoms, but also objective medical evidence—suggest that she lacks the capacity for frequent near visual acuity. And although the SSA reviewing doctors opined on Plaintiff's functional visual limitations, they inexplicably concluded that Plaintiff lacked *any* visual limitations, despite her severe retinal disorders. They also provided their last opinions in February 2016, which was well before Dr. Adenwalla diagnosed Plaintiff with neovascularization of the iris and treated her with injections and laser procedures. (*See* Pl. Br. at 6-7; *cf. Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (where new medical evidence from the plaintiff's treating physician significantly "changed the picture", the ALJ "erred by continuing to rely on an outdated assessment by a non-examining physician").) In these circumstances, the principle articulated in *Best*, 730 F. App'x at 382, does not assist Defendant. Nor is the court persuaded by Defendant's citation to case law stating that a functional limitation does not follow from a diagnosis alone. (Def. Mot. at 4 (citing *Collins v. Barnhart*, 114 F. App'x 229, 234 (7th Cir. 2004); *Allen v. Astrue*, No. 10 C 994, 2011 WL 3325841, at *12 (N.D. Ill. Aug. 1, 2011)).) The medical

22

records here exceed diagnoses; they contain doctors' descriptions of physical examinations and treatments provided. The court concludes that the ALJ's visual RFC determination is not supported by substantial evidence. Thus, the matter is remanded for reconsideration of Plaintiff's functional visual limitations.

### b. Manipulative Limitations

Plaintiff also argues that the ALJ did not adequately explain the basis for his determination that she can frequently, as opposed to occasionally or rarely, handle and finger bilaterally. The court agrees that substantial evidence does not support the ALJ's conclusion on this score, either. At step two, the ALJ determined that Plaintiff's trigger finger was not severe because (1) "examination findings in 2015 revealed normal pulses, intact motor function and sensation and no instability" and (2) "treatment notes in 2016 indicate [Plaintiff] had not seen a hand specialist in a couple of months." (R. at 21.) Plaintiff does not challenge the ALJ's conclusion that her trigger finger was not severe. Rather, she argues that in determining that she can frequently handle and finger bilaterally, the ALJ did not properly consider evidence about her actual difficulties in using her hands and fingers, which is documented in medical records and in her testimony. (See Pl. Br. at 7-8.) As Defendant notes, the ALJ stated in his RFC determination that Plaintiff's "protective sensation and neurological exams were generally intact and there was no evidence of any electromyogram/nerve conduction studies supporting the diagnosis" of peripheral neuropathy. (R. at 27; see Def. Mot. at 4-5 (citing same).) The ALJ added that Plaintiff "often denied paresthesia or focal weakness, joint stiffness, warmth or loss of range of motion at medical examinations." (R. at 27.) But the ALJ's description of this evidence is incomplete and does not support a finding that Plaintiff can perform light work that would require her to handle or finger bilaterally for between one and two-thirds of a workday. See SSR 83-10.

First, Plaintiff complained of joint stiffness that interfered with sorting paperwork and opening jars in September 2015, when she provided a physical impairment questionnaire to the SSA. (R. at 289.) She saw doctors for those symptoms in 2015 and 2016, and recounted similar

complaints at the August 2017 hearing. (R. at 63, 551-52, 585-86, 737, 741.) The ALJ's comment that Plaintiff "often" denied joint stiffness and dexterity loss does not square with this record, and the court has been unable to locate Plaintiff's purported denial of such symptoms. Second, although Dr. Kung noted in a 2015 examination that the "motors" in Plaintiff's right fingers were "intact" and that there was "no instability", he also diagnosed Plaintiff with right-hand trigger finger and gave her a steroid injection at the same appointment. (R. at 552.) Because Plaintiff displayed symptomatic trigger finger during the same medical visit the ALJ cites for the conclusion that she can frequently handle and finger bilaterally, the court cannot trace his logic. Third, although Plaintiff may not have followed up with a hand specialist in 2016, she visited Dr. Stumpf at least twice that year, and he observed edema and pain with flexion of the left wrist. (R. at 737, 740-41, 743.) The accounts from those visits are consistent with Plaintiff's complaint to Dr. Kung in 2015 of pain in both hands and detract from the conclusion that Plaintiff could frequently handle and finger bilaterally. The court also observes that the ALJ did not ask Plaintiff at the hearing why she did not receive follow-up treatment. (*See* R. at 62-63.) Thus, it was improper for him to draw negative inferences from that fact. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("[T]he ALJ must not draw any inferences about a claimant's condition" from failure to follow a treatment plan unless he "has explored the claimant's explanations as to the lack of medical care" (internal quotation marks omitted)); *see also Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016) (similar). Finally, even if the record contains no study "supporting the diagnosis" of peripheral neuropathy (R. at 27), that condition is not the same as trigger finger, which Dr. Kung diagnosed. That such a study is lacking, therefore, does not constitute evidentiary support for the ALJ's conclusion about Plaintiff's functional manipulative limitations. Nor does Plaintiff's ability to live alone and complete certain household chores constitute such support, in light of evidence that she receives so much help from her children. *See Mischler*, 766 F. App'x at 375; *Roddy*, 705 F.3d at 639.

Defendant responds that there was no error—or that any error was harmless—because Plaintiff "has not pointed to evidence requiring greater limitations than those identified by the ALJ."

(Def. Mot. at 5 (citing *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).)   Relatedly, Defendant argues that there was no error because "no physician, treating or otherwise, assessed *any* manipulative restrictions." (Def. Mot. at 5 (citing *Best*, 730 F. App'x at 382).)   The court, however, has just recounted objective medical evidence—including contemporaneous treatment records documenting findings from physical examinations—tending to show that Plaintiff does have manipulative restrictions.   The ALJ did not adequately explain why that evidence does not support greater limitations than he recognized.

The court concludes that the ALJ's determination of Plaintiff's functional manipulative limitations is not supported by substantial evidence.   Like the error concerning her functional visual limitation, this one is not harmless; according to the vocational expert, if Plaintiff were limited to handling and fingering only occasionally, she could not do any job in the national economy.   (R. at 77.)   Therefore, this matter is remanded for reconsideration of Plaintiff's functional manipulative limitations.

### c.   Mental Limitations

Finally, Plaintiff challenges the ALJ's failure to include any mental limitations in the RFC, despite determining that she has mild limitations in maintaining concentration, persistence, or pace.   Defendant correctly states that mild functional limitations may, but "do not inevitably," require an accommodation in an individual's RFC.   (Def. Mot. at 5-6 (citing *Sawyer v. Colvin*, 512 F. App'x 603, 611 (7th Cir. 2013).)   Nonetheless, "[i]n determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe."   *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *see also, e.g.*, *Pepper v. Colvin*, 712 F.3d 351, 366 (7th Cir. 2013) ("After a 'not severe' finding at step two," the ALJ must "assess the mental impairment in conjunction with the individual's RFC at step four").   An ALJ's "failure to fully consider the impact of non-severe impairments requires reversal."   *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010).

In his RFC analysis between steps three and four in this case, the ALJ did not discuss

25

Plaintiff's depression or mental limitations at all. As Defendant correctly notes, however, "it is proper to read the ALJ's decision as a whole." *Rice*, 384 F.3d at 370 n.5 (stating that "it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five"); *see also Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) ("In analyzing an ALJ's opinion for such fatal gaps or contradictions, we give the opinion a commonsensical reading rather than nitpicking at it." (internal quotation marks omitted)). Accordingly, the court will assume that the ALJ's RFC analysis incorporates his step-two analysis. His RFC determination is nevertheless infirm because the evidence discussed at step two is inadequate to support the ALJ's conclusion that Plaintiff can "perform basic mental work activities" without mental restrictions. (R. at 21.)

At step two, the ALJ discussed the evidence about Plaintiff's depression and mental restrictions at length. For example, he noted Dr. Buch's findings in October 2015 that Plaintiff had a "depressed affect" but was "fully oriented and cooperative", displayed "good" attention, concentration, abstract thinking, and social judgment, and displayed "average" memory. (R. at 21.) He also emphasized that Plaintiff has never been treated or hospitalized for depression or memory issues, nor has she taken medication for those conditions. (R. at 22.) And he recounted Plaintiff's ability to maintain a driver's license, operate a cell phone, provide information about her health, follow doctors' instructions, describe prior work history, listen to Bible study tapes, and watch DVDs. (R. at 23.) Even in light of these abilities, the ALJ determined that Plaintiff has mild limitations in concentration, persistence, or maintaining pace. (R. at 22.) Thus, evidence of those abilities is not enough to support the conclusion that Plaintiff's limitations require no accommodation.

The same reasoning defeats Defendant's arguments that (1) Plaintiff "points to no evidence of limitations other than her self-reports" of memory problems, fatigue, and difficulty handling stress, and (2) "[n]o doctor opined that Plaintiff experienced mental limitations on [her] ability to do work." (Def. Mot. at 6-7.) Without greater explanation of the ALJ's reasoning, the

sole evidentiary support for the conclusion that Plaintiff can perform mental work without restrictions cannot be the same evidence that permitted a finding that she has mild mental limitations.  Nor is the court moved by the principle that an ALJ need not "include limitations in the RFC that were not supported by the evidence."  (Def. Mot. at 6 (citing *Pepper*, 712 F.3d at 363 (similar); *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012) (an ALJ need only "minimally articulate" his reasoning); *see also* Def. Mot. at 7 (arguing that the ALJ's determinations are supported by substantial evidence).)  Here, the ALJ failed to include limitations in his RFC analysis without any explanation about why they are not supported by the evidence.

Because the ALJ did not account for Plaintiff's mild mental limitations in determining her RFC, this case must be remanded for further proceedings.  *See Denton*, 596 F.3d at 423; *see also, e.g.*, *Cheryl C. v. Berryhill*, No. 18 C 1443, 2019 WL 339514, at *2-4 (N.D. Ill. Jan. 28, 2019) (remanding in similar circumstances); *Hearan v. Berryhill*, No. 17 C 0542, 2018 WL 3352657, at *3 (N.D. Ill. July 9, 2018) (remanding when ALJ failed to account for the claimant's mild mental limitations in the RFC and stated only that the claimant's affective disorder "does not cause more than minimal limitation in [her] ability to perform basic mental work activities and is therefore nonsevere")).  On remand, the ALJ must specifically assess whether Plaintiff's mild mental limitations require an accommodation in the form of mental or non-exertional restrictions.  If he determines that they do, he must include those restrictions in his RFC assessment and the hypothetical questions he poses to the vocational expert.  *See, e.g.*, *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) ("If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." (quoting *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)); *Cheryl C.*, 2019 WL 339514, at *4.

### 2.      Other Arguments

In challenging the ALJ's decision, Plaintiff also contends that he did not properly consider her testimony about her symptoms and limitations.  The court has addressed this argument,

where relevant, in its discussion of the ALJ's RFC determination, but declines to address the matter with reference to other medical conditions. That said, on remand, the ALJ should consider how the combination of Plaintiff's medical conditions, such as her severe asthma and sleep apnea, affect her RFC. *See Morgan v. Astrue*, 393 F. App'x 371, 374-75 (7th Cir. 2010) (in determining a claimant's RFC, an ALJ is "obligat[ed] to consider the aggregate impact of [her] impairments"). Last, Plaintiff maintains that in concluding she can perform past work as an office associate/check writer and general clerk, the ALJ failed to consider the requirements of the jobs as she performed them. Because the court is remanding this matter for further proceedings on the RFC determination, it would be premature to entertain this argument. The court, however, instructs the ALJ on remand to compare the specific requirements of Plaintiff's past relevant jobs to her functional capacity. *See, e.g.*, *Rainey v. Berryhill*, 731 F. App'x 519, 524 (7th Cir. 2018) ("In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings . . . [a] finding of fact as to the physical and mental demands of the past job/occupation." (quoting Social Security Ruling (SSR) 82-62, 1982 WL 31386, at *4)).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment affirming the Secretary's decision [20] is denied. The court sustains Plaintiff's objections to that decision and remands this case pursuant to Sentence Four of 42 U.S.C. § 405(g) for proceedings consistent with this opinion. Civil case terminated.

ENTER:

Dated: December 29, 2020

_____
REBECCA R. PALLMEYER
United States District Judge